## SKILLED NURSING FACILITY MANAGEMENT AGREEMENT

This Management Agreement (this "**Agreement**") is entered into as of October 8, 2021, by and between Boonton Care Center LLC, a New Jersey limited liability company (the "**Company**"), and Fallsview at Boonton LLC, a New Jersey limited liability company (the "**Manager**") (the Company and the Manager shall each individually be referred to herein as a "**Party**", and collectively, the "**Parties**").

**WHEREAS**, the Company is the licensed operator of the "Boonton Care Center" (the "**Facility**"), a skilled nursing facility located at 199 Powerville Road, Boonton, New Jersey 07005 (the "**Real Estate**"); and

**WHEREAS**, the Company wishes to retain the Manager, and the Manager has agreed to be retained, to provide the management services set forth herein to assist the Company in the operation of the Facility, in each case, in accordance with the terms and provisions set forth in this Agreement;

**NOW**, **THEREFORE**, in consideration of the obligations, promises and covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to the following terms and conditions:

1.     **Engagement of the Manager**. During the Term (as hereinafter defined), the Company hereby engages and appoints the Manager as the sole and exclusive manager with respect to the Company's operation of the Facility, in accordance with the standards of conduct set forth herein, and the other terms and conditions hereinafter provided. The Manager hereby accepts such engagement and appointment, and agrees to perform the duties and obligations set forth in this Agreement and to comply with all of the terms and conditions set forth herein.

2.     **Specific Duties and Authority of Manager**. In addition to all functions expressly or impliedly granted to Manager in Section 1 of this Agreement, and without limiting the generality thereof, Manager shall provide the following services and shall have the right to exercise the following powers and perform the following functions (collectively, the "**Management Services**"):

a.     To supervise the Facility's staff in the general management of the Facility as Manager determines is reasonably necessary for the maintenance and operation of the Facility.

b.     To recruit, select, hire, employ, train, supervise, promote, direct, and terminate on behalf of the Company the employment of any and all professional and non-professional personnel (collectively, the "**Employees**"), as necessary and in Manager's sole discretion, for the proper maintenance and operation of the Facility. To the extent any Employees of the Company have any employment agreements with the Company or are otherwise legally entitled to any monetary or other benefits outside of those generally owed to "at will" employees, the Company agrees to make Manager fully aware of any such obligations and to provide Manager with any and all relevant documentation and information in connection therewith. All Employees shall at all times be deemed to be employees of the Company, and not the Manager, and the Company authorizes the Manager to establish and manage all compensation of the Employees,

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8

including, without limitation, salary, bonuses, employee benefits, and all other matters relating to their employment, including job classifications, personnel policies, and employee performance standards for the Employees to assist the efficient operation of all departments within and services offered by the Facility. Nothing herein is intended to make Manager a joint employer with the Company or of any employee. Subject to the terms hereof, the Company shall pay the wages, benefits or any claims of all employees arising from their employment or termination of employment.

c.    To maintain and manage the accounts receivables, accounts payable, payroll tax requirements, cash management and treasury operations, and all other income, expenses, assets and liabilities in connection with the Facility.

d.    To cause to be paid from available funds of the Company, all expenses, costs, taxes, utilities and other charges incurred by or on behalf of the Company in connection with the maintenance or operation of the Facility, and to otherwise manage the allocation of funds of the Company in satisfaction of its liabilities.

e.    To obtain and renew all insurance policies that Manager deems either required or in the best interest of the Company, and to name Manager as an additional insured on any such policies, as applicable.

f.    To procure and provide for replacements, repairs and additions to the personal property used in the operation of the Facility.

g.    To maintain complete and separate books of account and other accounting records for the Company, which books and records shall be available to the designees of the Company, upon two (2) business days' prior written notice, during regular business hours at the offices of Manager or at such other place reasonably designated by Manager.  Manager shall cause monthly operating statements to be provided to the Company promptly after they are prepared, reflecting the financial activity and the financial status as of the end of such month with respect to the Facility.

h.    To perform, or engage others to perform, administrative, accounting, bookkeeping, billing, and collection services for the Company in connection with the Facility, as Manager may deem necessary or desirable in furtherance of the maintenance or operation of the Facility.

i.    To the extent the Facility receives notice from any governmental authority with respect to a deficiency, violation, non-compliance, or condition at the Facility that requires correction (whether or not subject to a fine, penalty, civil monetary penalty or other enforcement) (a "**Government Action**"), upon approval by the Company, which shall not by unreasonably withheld and delivered timely, Manager shall submit a plan of correction on behalf of the Company and shall further have authority, after approval by the Company, to challenge, negotiate, and settle any fines, penalties, or other enforcement issued by such governmental authority, on behalf of the Company.

j.    To perform such other acts and provide such other services as shall be, in Manager's discretion, necessary or proper in order to maintain and operate the Facility.

2

k.      To negotiate and enter into agreements or contracts on behalf of Company, in connection with any of the foregoing.

l.      To coordinate actions to maintain all licenses, permits and certificates required for the operation of the Facility, and ensure that appropriate certifications and accreditations are obtained and maintained.

m.      To prepare and file, or retain others to prepare and file, all Medicaid and/or Medicare cost reports and all other licensure and certification reports related to the Facility in order to maintain the Facility licensure and Medicaid and/or Medicare certifications and contracts, as applicable, provided, however, that Company shall be responsible to timely provide all information necessary, and cooperate with Manager, to file such cost reports related to periods prior to the Term and Manager shall not bear any responsibility or liability for any loss, expense, claim, liability, costs or expenses due to the failure of Company to timely provide such true, accurate, complete and correct information or due to the nature of such information.

n.      To establish bank accounts in the name of the Company for the deposit of revenues, loan proceeds and payment of expenses with signatory authority over such account.

o.      To make capital expenditures as necessary for the proper operation of the Facility; provided, however, that to the extent Manager deems it necessary to make a capital expenditure in excess of $10,000 (each, a "**Major Capital Expenditure**"), Manager shall first seek approval by Company for each such Major Capital Expenditure, which approval shall not be unreasonably withheld, delayed or conditioned.

p.      To terminate vendors, suppliers, and other service providers and replace same with other vendors, suppliers and service providers as Manager deems appropriate for the operation of the Facility and to negotiate and enter into amendments to managed care, insurance, or governmental payor contracts or other network affiliations on behalf of the Company.

q.      Subject to the provisions of this Agreement, to pay any and all expenses, liabilities, debts, obligations and other charges arising from or incident to the operation of the Facility during the Term first from revenue and income of the Facility, and if insufficient, to fund the Company to pay such items, including payroll, accounts payable and amounts due under any vendor agreement, financing or credit agreement (including principal and interest thereunder), lease or other contract to which the Facility is a party or otherwise bound (the "**Facility Expenses**").

r.      Such other acts as are appropriate to the management of the day to day operations of the Facility or to expand, improve, modify, reduce or initiate programs, activities, services, advertising, promotions, outreach, or non-clinical policies or procedures that Manager determines appropriate for the improved operations of the Facility, compliance with law, employee morale or retention, or for the residents, family members or the community.

3.      **Control Retained by Company**. Notwithstanding anything else contained in this Agreement to the contrary, Manager's activities shall be subject to the policies, procedures and oversight of the Company, which shall retain the ultimate responsibility for assuring the Facility's compliance with applicable law, its licensure, and conditions of participation and each of the

3

foregoing powers and authorities listed above are circumscribed and limited to exclude from such authority any authority or oversight responsibility vested with the Company under applicable law. Without limitation of the foregoing, the Management Services to be provided by the Manager hereunder do not include, and the Company has and shall at all times retain under this Agreement the ultimate responsibility for, all operational decisions at the Facility and control over the assets of the Facility that are exclusively vested in the licensed operator of the Facility under applicable law. The Company shall be the holder of all licenses, permits and contracts obtained with respect to the Facility, and shall be the "provider" within the meaning of all third- party contracts for the Facility. Specifically, and without limitation, the Company shall also hold the Medicare and Medicaid provider numbers and provider agreements. This Agreement shall not constitute an assignment (automatic or otherwise) by the Company to Manager of the licenses, permits, contracts, certifications or provider numbers with respect to the Facility. In the event of a conflict between the delegations to Manager contained in this Agreement and the Company's responsibilities under its licensure, the Company will retain and exercise the requisite oversight and approval over the policies and compliance obligations of the Facility such that Manager will perform its duties subject to and in conformity with same.

4.      **Standard of Conduct**. Manager covenants (i) to perform all of its obligations and conduct all of its activities hereunder in accordance with the standard of diligence and care normally employed by similarly qualified managers in the performance of comparable work and in accordance with practices appropriate to the activities undertaken; (ii) to exercise reasonable care and diligence in carrying out its responsibilities; and (iii) at all times seek to comply with all applicable laws, regulations, and professional ethics and standards applicable to the maintenance and operation of the Facility.

5.      **Primary Goals and Quality Care**. In performing the Management Services hereunder, the Manager shall, acting pursuant to the policies and within the financial resources of the Company, seek to maintain and improve the operations of the Facility to:

(i)      Permit the Company to provide or contract for quality nursing, pharmacy, and rehabilitation and related services for the benefit of the residents;

(ii)      Maintain programs to promote the effective utilization of the Facility's services by its residents;

(iii)      Create a public image of quality and caring for the Facility;

(iv)      Create and promote quality and proper staffing of the Facility;

(v)      Institute sound financial accounting systems and internal fiscal controls through effective budgeting procedures;

(vi)      Preserve the assets of the Facility, through sound operating and billing procedures;

(vii)      Manage the cash position of the Facility, through sound collection methods;

4

(viii)    Take such other steps as are necessary to provide quality care to all residents of the Facility; and

(ix)    Adhere to and fully comply with all applicable State and Federal laws, rules and regulations.

6.    **Obligations of the Company**. At all times during the Term of this Agreement, the Company covenants and agrees as follows:

(a)    The Company shall cooperate with Manager in every respect to allow Manager to perform its services under this Agreement and will furnish Manager with all information required by it for the performance of its services under this Agreement.  The Company shall permit Manager full access to the Facility and will allow Manager to examine and copy any data in the possession and control of the Company affecting management and/or operation of the Facility.

(b)    The Company shall examine documents submitted by Manager and render reasonable decisions pertaining thereto, when required, promptly, to avoid unreasonable delay in the progress of Manager's work, and, in any event, if the Company shall not respond negatively in writing to a written notice from Manager within thirty (30) days after the notice is sent, the Company shall be deemed to have approved the matter submitted to The Company.  In any emergency situation (as reasonably determined by Manager), Manager shall not be required to seek or obtain the Company's approval for any actions which Manager, in its sole judgment, deems necessary or appropriate to respond to such situation, provided Manager promptly thereafter reports such action to the Company in writing.  The Company shall execute and deliver any and all applications and other documents that may be deemed by Manager to be necessary or proper to be executed by the Company in connection with the operation of the Facility.

7.    **Term; Termination; Default**. The term of this Agreement ("**Term**") shall commence as of the date hereof and shall terminate upon the earlier of:

(a)    The giving of written notice by either Party to the other expressing its intent to terminate this Agreement in the event:  (i) the Company and the Manager (or an affiliate thereof) do not enter into both an Operations Transfer Agreement ("**OTA**") and a Real Estate Purchase Agreement ("**REPA**") for the purchase of the Real Estate within thirty (30) days hereof; or (ii) of any termination of the OTA or REPA in accordance with their terms;

(b)    the Closing of the transactions contemplated by the OTA in accordance with its terms; or

(c)    any breach by a Party of its obligations hereunder, provided, that (i) the Party seeking to terminate this Agreement pursuant to this clause (the "**Terminating Party**") (A) shall not be in breach of its obligations hereunder, and (B) shall provide written notice to the other Party (the "**Breaching Party**") specifying in reasonable detail the nature of the breach (to the extent then known by the Terminating Party), and (ii) the Breaching Party shall fail to cure any such breach within thirty (30) days of its receipt of such notice, provided, however, that if the Breaching Party provides written notice of its intent to cure, and diligently pursues such cure, then the aforesaid thirty (30) day period shall be extended for a reasonable period necessary to effect such cure (which shall not exceed ninety (90) days).

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8

Upon termination of this Agreement for any reason, the Manager shall reasonably cooperate with the Company to accomplish an orderly transfer of the management of the Facility to the party designated by the Company. Termination of this Agreement shall not terminate or affect any liability or obligation of the Parties arising prior to such termination.

7    **Prorations**.

(a)    For the period commencing on October 1, 2021 and continuing until the date which is thirty (30) days from October 1, 2021 (the "**Transition Date**" and such period, the "**Pre-Transition Period**"), (i) the Manager shall collect and apply all revenue and receipts arising from, or relating to, Facility operations to the payment of such Facility Expenses as shall be designated by the Company, and (ii) the Company shall, upon notice from the Manager that additional funds are needed to pay any Facility Expenses that arise or accrue during the Pre-Transition Period, promptly deposit such funds in the appropriate Facility bank account so that any and all Facility Expenses for the Pre-Transition Period can be paid in full and in a timely manner. During the Pre-Transition Period, if the Manager deems it necessary to make any Facility Expenses outside the ordinary course of business (each a "**Major Facility Expense**"), Manager shall first seek approval by Company for each such Major Facility Expense.

(b)    From and after the Transition Date and during the Term of this Agreement (the "**Post-Transition Period**"), (i) the Manager shall collect and apply all revenue and receipts arising from, or relating to, Facility operations during the Pre-Transition Period or Post Transition Period to the payment of such Facility Expenses as shall arise or accrue during the Post-Transition Period, and (ii) to the extent that the Facility revenue and receipts are insufficient to pay all such Facility Expenses that arise or accrue during the Post-Transition Period, the Manager shall advance to the Company (each, an "**Advance**" and collectively, the "**Advances**") such amounts as are necessary in order to pay such Facility Expenses in a timely manner.

(c)    Without limitation of the foregoing, the Company shall, prior to the Transition Date, pay any and all outstanding provider taxes, bed taxes, fines, penalties and other impositions in respect of the operations of the Facility and provide Manager with proof of payment thereof. The Company shall, and authorizes the Manager on its behalf to, apply for and seek all such additional Covid or other stimulus funds, grants and advances as may be available in respect of the operations of the Facility and, upon receipt thereof, the same shall be delivered to the Manager to be applied to the payment of Facility Expenses arising during the Post-Transition Period; provided that, all Employee Retention Credits received during the Pre-Transition Period shall be credited to the Company.

(d)    In order to implement the provisions of the preceding paragraphs (a) and (b), all Facility Expenses shall be apportioned between the Company and Manager such that the Company shall be responsible for all Facility Expenses and obligations arising from the operation of the Facility prior to the Transition Date, and Manager shall be responsible for all Facility Expenses and obligations arising from the operation of the Facility after the Transition Date during the Term. This provision shall be implemented by each party remitting to the other any invoices that it receives that reflect a service date for which the other party is responsible. All such prorations shall be made on the basis of actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available.

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8

(e)    All such prorations shall be made on the basis of actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available. Utility charges which are not metered and read shall be estimated based on prior charges and shall be re-prorated upon receipt of statements therefor.

(f)    Notwithstanding anything herein, if this Agreement is not terminated in accordance with its terms prior to the expiration of Pre-Transition Period then, it shall be the sole and exclusive responsibility of the Manager, and not the Company, to (i) ensure appropriate certifications and accreditations are obtained and maintained, and to take all actions necessary, at the Manager's sole cost and expense, to obtain a Temporary Construction Waiver with respect to the K 161 notice from the New Jersey Department of Health's and New Jersey Department of Health's refusal to accept the Facility's Fire Safety Evaluation Survey for 2021 (the "**K 161 Notice**"); (ii) make all Major Capital Expenditures necessary to address the K 161 Notice; and (iii) take any and all actions, at the Manager's sole cost and expense, to address and resolve the K 161 Notice in a manner favorable to the Facility. Manager's obligations under this Section 8(f) shall survive termination of this Agreement for any reason, other than a termination arising by reason of a default by the Company (or any affiliate thereof) under the OTA or REPA or this Agreement.

8    **Management Fee**.

(a)    During the Pre-Transition Period, and as compensation for the Manager's services to be provided hereunder, the Company agrees to pay the Manager a management fee (the "**Management Fee**") in an amount equal to five percent (5%) of the Net Revenue of the Facility arising or accrued during the Pre-Transition Period. For the purposes of this section, "**Net Revenue**" means all operating revenues (including paid or payable by residents or patients of the Facility) and non-operating revenues, receipts, rentals and income and other moneys of, or received by or on behalf of, the Facility from all sources, and all rights to receive the same, whether in the form of accounts receivable, contract rights, chattel paper, instruments, general intangibles or other rights and all proceeds thereof, whether now existing or hereafter coming into existence and whether now owned or hereafter acquired, and the proceeds thereof; less contractual adjustments with third party payors. Net Revenue shall be determined in accordance with generally accepted accounting principles, consistently applied.

(b)    Commencing as of the Transition Date and continuing for all periods throughout the Term, and in addition to the Management Fee payable pursuant to the preceding paragraph, the Manager shall be entitled to an additional Management Fee equal to the excess, if any, of the Net Revenue over Facility Expenses, which Management Fee shall be payable solely and exclusively from Net Revenue.

(c)    The Management Fee due under paragraph (a) above shall be due and payable no later than November 15, 2021 and shall be paid by the Company directly to the Manager solely from the Net Revenue arising during the Pre-Transition Period. The Management Fee due under paragraph (b) above shall be due and payable on December 1, 2021, and on the first day of each month thereafter throughout the Term and shall be based on the monthly financial statements of the Facility for the next to last month prior to such date, and the Manager is authorized to pay itself such Management Fee each month and shall provide the Company with its calculation thereof. The Parties agree that the Management Fee paid each month is subject to a final reconciliation upon

7

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8

the completion of the annual financial statements of the Facility. At all times throughout the Term, the Company shall have the right to inspect and audit the any books and records maintained by Manager in accordance with Section 2(g) hereof in order to verify any payments made by Manager hereunder.

(d)     In addition to the foregoing, the Manager may apply Net Revenue arising during the Post-Transition Period to the payment of all Advances made hereunder. All amounts payable to the Manager hereunder, including Advances, shall accrue interest at eight percent (8%) per annum until paid, provided that, except as set forth in paragraph (c) above, the sole source of payment shall be the Facility Net Revenue arising during the Post-Transition Period.

9     **Relationship of the Parties**. Manager shall perform its obligations under this Agreement solely as an independent contractor. The Parties acknowledge and agree that Manager may be providing similar services for other businesses or may be otherwise employed during the Term. Except as expressly provided in this Agreement, nothing shall deprive or otherwise affect the right of Manager to provide services to others, notwithstanding the fact that Manager's other clients may be engaged in businesses that are either directly or indirectly in competition with the Facility. The parties do not intend to create a joint venture, partnership or other business entity and the relationship of the parties shall be solely that of principal and agent.

10 **Indemnification**.

(a)     The Company agrees to indemnify, defend, and hold harmless, the Manager and its employees, affiliates, managers, attorneys, members, officers, directors and agents (the "**Manager Indemnified Parties**") against or in respect of any threatened or actual claim, suit, action, proceeding, investigation or inquiry (collectively, a "**Proceeding**"), and all losses, claims, judgments, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees and related expenses incurred by the Manager Indemnified Parties (including the cost of enforcing this Agreement and this indemnification provision) ("**Losses**") arising out of or relating to (i) the operation of the Facility by the Company or any of its affiliates prior to the date hereof, (ii) any Facility Expenses prior to the Transition Date; provided however, that Manager obtained prior written approval from the Company for any Major Facility Expenses made during the Pre-Transition Period in accordance with Section 8(a) hereof, (iii) except as otherwise provided herein, any Government Action or related matter, whether with respect the Company or its affiliates, its current management, members or otherwise, arising with respect to any event, occurrence or omission prior to the date hereof, (iv) any claims or disputes among the current members and/or investors of the Company or its affiliates; and (v) a breach by Company or its affiliates of their duties hereunder.

(b)     The Manager agrees to indemnify, defend, and hold harmless, the Company and its employees, affiliates, managers, attorneys, members, officers, directors and agents (the "**Company Indemnified Parties**") from and against any and all Proceedings and Losses arising out of or relating to (i) the operation of the Facility by the Manager from and after the date hereof (except as otherwise set forth in Section 8(a)), (ii) any Facility Expenses relating to periods after the Transition Date and during the Term hereof, (iii) any Government Action or related matter resulting from any action taken, or event or condition caused by, the Manager, (iv) the provision

8

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8

of the Management Services by Manager as set forth in this Agreement, and (v) a breach by Manager or its affiliates of their duties hereunder or from their insolvency.

(c)    These provisions contained in this Section 11 shall expressly survive termination of this Agreement for any reason and be in effect until the statute of limitation of any claims subject to indemnification expire.

11    **Company Representations**. The Company represents and warrants that it (i) is a limited liability company duly organized and validly existing and in good standing under the laws of the State of New Jersey; (ii) has the full power, authority and legal capacity to execute, deliver and perform this Agreement in accordance with its terms, and such execution, delivery and performance has been approved by all requisite corporate action of the Company; (iii) this Agreement has been duly executed and delivered by such party and is enforceable against such party in accordance with its terms; (iv) the performance of this Agreement and the transactions contemplated hereby will not conflict with, contravene, violate or result in any material breach of or give rise to any right of termination or require the consent of or a notice to any party under any law, judgment, decree, order, statute, rule or regulation, or any governing documents of such party; (v) is not subject to any pending, or to its knowledge, threatened, governmental claims or investigations, or other claims, litigation, or threatened claims of third parties against the Company.

12    **Manager Representations**. Manager represents and warrants that it (i) is a limited liability company duly organized and validly existing and in good standing under the laws of the State of New Jersey; (ii) has the full power, authority and legal capacity to execute, deliver and perform this Agreement in accordance with its terms, and such execution, delivery and performance has been approved by all requisite corporate action of Manager; (iii) this Agreement has been duly executed and delivered by Manager and is enforceable against Manager in accordance with its terms; (iv) the performance of this Agreement and the transactions contemplated hereby will not conflict with, contravene, violate or result in any material breach of or give rise to any right of termination or require the consent of or a notice to any party under any law, judgment, decree, order, statute, rule or regulation, or any governing documents of Manager.

13    **Access to Records**. Nothing in this Agreement shall be deemed to restrict the right of the Company to access and review all reports or other filings with, and communications from, any governmental authority or agency having jurisdiction over the Facility and all resident, financing, and other operational records of the Facility.

This paragraph is included herein because of the possible application of Section 1861(v)(1)(I) of the Social Security Act to this Agreement. If such Section 1861(v)(1)(I) is found not applicable to this Agreement under the terms of such Section and the regulations promulgated thereunder, then this paragraph will be deemed not to be a part of this Agreement and will be conclusively deemed by the parties to be null and void. Until the expiration of four (4) years after the furnishing of services pursuant to this Agreement, Manager will, as provided in Section 1861(v)(1)(I) of the Social Security Act and regulations promulgated thereunder, make available, upon written request, to the Secretary of Health and Human Services or to the Comptroller General of the United States or any of their duly authorized representatives, this Agreement and all books, documents, and records of Manager that are necessary to verify the nature and extent of the costs of any services

9

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8

furnished pursuant to this Agreement for which payment may be made under the Medicare program.  Any party receiving a request for documents or information under this provision will promptly notify the other party.

14 **Notices**. All notices to be given by either Party to this Agreement to the other Party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by e-mail, to the addresses set forth on the signature page hereof. Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; any such notice delivered via email shall be deemed delivered upon the notifying Party's receipt of electronic confirmation of such transmission, with a copy sent to the receiving Party's counsel. Any Party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

15 **Binding Effect**. Each of the respective provisions of this Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their respective successors and assigns.

16 **Attorneys' Fees**. If an action shall be brought under or pursuant to this Agreement, for or on account of any breach of this Agreement, or to enforce or interpret any of the terms, covenants, or conditions of this Agreement, the prevailing party shall be entitled to receive its reasonable attorneys' fees and costs from the other Party.

17 **Waiver**. The waiver by either Party of any breach of any term, covenant, or condition of this Agreement shall not be a waiver of any prior or subsequent breach of such term, covenant, or condition, or of any breach of any other term, covenant, or condition of this Agreement.

18 **Severability**. In the event that any court, administrative agency, or other governmental entity with jurisdiction and authority to interpret this Agreement or any portion hereof, or to otherwise control any performance hereunder, determines that any term or combination of terms is invalid or unenforceable, such term or terms shall be construed, upon the mutual agreement of the Parties hereof, in such a way as to accomplish the apparent purpose of such term or terms and this Agreement to the greatest extent possible. If, notwithstanding the intentions and directions of the Parties hereto which are set forth herein, any such court, administrative agency, or other governmental entity finds any term or combination of terms to be invalid or unenforceable under applicable law. such determination shall not affect, impair, or render invalid or unenforceable the remainder of this Agreement, nor any other clause, phrase, provision, or portion hereof.

19 **Governing Law and Jurisdiction**. This Agreement and all matters arising under or pertaining to this Agreement shall be governed and controlled by the internal laws of the State

10

of New Jersey as to interpretation, enforcement, validity, construction, effect, and in all other respects, without regard for any principles of conflict of laws.

20      **Entire Agreement**. This Agreement constitutes the entire agreement between the Parties with respect to the matters set forth herein, and may not be amended or modified, except by an instrument in writing signed by all of the Parties to this Agreement.

21      **Counterparts/Facsimile Signatures**. The Parties may execute this Agreement in counterparts. Electronic signatures shall have the same force and effect as original signatures of the Parties hereto.

22      **Pronouns and Headings**. As used herein, all pronouns shall include the masculine, feminine, neuter, singular, and plural thereof, wherever the context and facts require such construction. The headings, titles, and subtitles herein are inserted for convenience of reference only and are not to be construed as part of this Agreement, or as in any way defining, limiting, or amplifying its provisions.

23      **Contract Modification**. If any laws or regulations, now existing or promulgated hereafter, are interpreted by judicial decision or a regulatory agency in such a manner as to indicate that the structure of the transactions contemplated under this Agreement is or may be in violation of such laws or regulations, this Agreement shall be automatically amended to the fullest extent necessary to remedy the applicable violations while preserving the underlying economic and financial arrangements to the extent possible.

24      **Further Actions**. The Parties hereto agree to take such additional actions, and execute, file, or record any and all such additional documents or instruments, as may be necessary in order to carry out the intent and purpose of this Agreement.

*[Remainder of this page left intentionally blank; signature page follows]*

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first stated above.

**BOONTON CARE CENTER, LLC**

By: _____

Name: Brian Natanov

Title: Member

**MANAGER:**
**FALLSVIEW AT BOONTON LLC**

By: _Ben Kurland_____

Name: Ben Kurland

Title: Manager

12

4810-7789-5638.v1
4810-7789-5638.v5
4810-7789-5638.v8